L. H. WIAR, Appellee, v. WABASH RAILROAD COMPANY, Appellant.

**Railroads:** CROSSING ACCIDENT: EVIDENCE: HARMLESS ERROR. Where
1    plaintiff, injured at a railway crossing by a collision of his automobile with defendant's train, showed that he exercised ordinary care to avoid the accident after discovering the approaching train, evidence that he was skilled in handling engines, if erroneously admitted, was not prejudicial.

**Same:** EVIDENCE: CONCLUSION. The inquiry of a witness whether an
2    engine whistled between public crossings calls for the statement of a fact, and his negative answer is competent evidence.

**Same:** EVIDENCE: CROSS EXAMINATION. Where the baggage man on
3    the train which collided with plaintiff testified that the engine whistled several times on approaching the town at which plaintiff was injured, his cross-examination as to other engine signals on the trip was proper, for the purpose of testing his power of observation and recollection.

**Same:** CROSSING ACCIDENT: STATUTE: INSTRUCTION. It is the duty
4    of one operating an automobile to have his machine under control when approaching a railroad crossing, independent of the statute requiring him to do so at highway crossings, bridges, etc.; and as the statute has but a remote application, if any, to railway crossings, failure to instruct concerning its applicability to the facts in this case was not erroneous, especially as no instruction on the proposition was asked.

**Same:** NEGLIGENCE: INSTRUCTION: SUFFICIENCY. The instruction as
5    given in this case defining the duty of the railway company concerning the giving of signals and the operation of the train on approaching the crossing in question, is held to properly submit

the issue of negligence, and was not objectionable as being abstract rather than concrete.

**Practice:** MOTION FOR DIRECTED VERDICT: WAIVER. A motion for a directed verdict at the close of plaintiff's evidence is waived by defendant proceeding to introduce his own testimony.

**Same:** VERDICT: CONCLUSIVENESS. Where there is a substantial conflict in the evidence the verdict will not be disturbed on appeal, though not in conformity with the greater number of witnesses.

**Railroads:** NEGATIVE AND POSITIVE EVIDENCE. The testimony of witnesses that they did not hear signals of a train on approaching a crossing is not purely negative, but is sufficient to create a conflict with the positive testimony of other witnesses that they heard signals.

**Same:** CONTRIBUTORY NEGLIGENCE: EVIDENCE. Under the evidence in this case the question of whether plaintiff was guilty of contributory negligence in approaching the crossing was for the jury.

**Verdict:** DEFINITENESS. A verdict for a definite sum and interest at six per cent from a certain date is not void for uncertainty in amount, as the total amount allowed is a mere matter of computation.

**New trial:** AMENDMENT TO MOTION. An amendment to a motion for new trial filed more than a month after the return of the verdict comes too late, and in the instant case was not germane to anything in the original motion.

*Appeal from Page District Court.*—HON. THOMAS ARTHUR, Judge.

MONDAY, DECEMBER 15, 1913.

ACTION at law to recover damages for injuries received by plaintiff and for damages done to an automobile resulting from a collision with one of defendant's passenger trains at a highway crossing in the northeastern part of the town of Coin, in Page County, Iowa. The defendant denied all negligence and pleaded contributory negligence on the part of the plaintiff. On the issues joined, the case went to a jury, resulting in a

verdict and judgment for plaintiff in the sum of $1,995, with interest. Defendant appeals.—*Affirmed.*

*J. L. Minnis* and *Jennings & Mattox,* for appellant.

*Denver L. Wilson,* for appellee.

DEEMER, J.—The accident occurred on the evening of August 21, 1909, at a railway crossing known as the "Weaver crossing," which is about a mile north of the depot at the town of Coin. Plaintiff, who was driving an automobile in which he had as a guest one Hutchinson, while attempting to cross this crossing going in an easterly direction, was struck by one of defendant's regular trains, known as No. 50, en route from Omaha, Neb., to some point in Missouri, and his companion was killed, the automobile practically destroyed, and plaintiff himself cut, bruised, and injured. It is claimed that the train was running at an unusual and dangerous rate of speed; that it gave no signals for the crossing; that the right of way was covered by weeds and brush which had grown so high as to totally obscure the approach of trains to the crossing; and that the crossing itself had become out of repair and was practically impassable. Plaintiff alleges that he took the usual or more than the usual precautions and was guilty of no negligence on his part. All these allegations were denied by the defendant, and it specifically pleaded contributory negligence on the part of the plaintiff.

As we understand it, the only negligence submitted to the jury was the question as to whether or not defendant's employés gave proper signals of the approach of the train. All other matters alleged were treated as secondary to this one main question and as perhaps having some bearing thereon, but not as primary grounds of negligence. The instructions themselves will be considered, so far as necessary in a subsequent part of this opinion. Fourteen errors are assigned, and, to such as are regarded as material or controlling, we shall

give our attention.   The attached plat will aid in understanding the case.

This plat, the top of which is to the north, shows the highway upon which the plaintiff was traveling; the way in which it approaches and crosses the railway; the Weaver crossing; and the town of Coin.   There is also another crossing shown on the map, known as "Whitmore's," which is about a half mile north of the Weaver crossing.   The other railway shown on the map is the Chicago, Burlington & Quincy, but it crosses the defendant's tracks and runs east and west.   It crosses the Wabash tracks by an overhead bridge which is something like thirty feet above the rails of defendant's tracks. The ground to the north of this crossing and on the west side of defendant's tracks is high, and it is claimed was so covered by timber and weeds at the time of the accident that one

going north on the highway leading to the Weaver crossing
could not see an approaching train until he was within fifteen
feet of the west rail of the defendant's tracks. The crossing
is near the foot of a hill, which runs nearly three miles to
the north of the crossing, and the curvature in the track is
rather sharp, as the plat indicates. The train which struck the
plaintiff was coming from the north and west, and plaintiff
was going north with his machine from the town of Coin, in-
tending to cross the railway at the Weaver crossing. It is
also contended that the crossing was bad because of a washout
of dirt from the east rail of the track, leaving a drop off of
from six to ten inches deep. What is known as the "Gibson
corner" (not marked on the plat) is from 280 to 300 feet
west of the Weaver crossing, and the road is slightly down-
grade from this corner to the defendant's tracks. There is
also a bridge in the highway, not shown by the map, 300 or
400 yards south of the Gibson corner. Plaintiff drove over
this bridge, went to the Gibson corner, and thence eastward to
the Weaver crossing, where he was struck by the train. The
train came coasting down the hill, no smoke or steam escaping
from the engine, and as plaintiff claims, at the rate of sixty
miles an hour, without any signals or warning sounds being
made within a mile of the crossing. He says that his view of
the train was obstructed by reason of the topography of the
ground between him and the train and because the inter-
vening hill or rise in the ground was covered by timber and
by brush and weeds, and that notwithstanding diligence on
his part, both in the handling of his machine and in looking
and listening for the approach of the train, he did not see it
until he was within four or five feet of the tracks, it then
being from fifty to one hundred feet away, and that, not-
withstanding every effort on his part, he was struck by the
train.

I.   The first errors complained of relate to rulings on
the admission and rejection of testimony. A witness, over

defendant's objections, was permitted to testify that he con-
sidered plaintiff good in the handling of en-

**1. RAILROADS:**
**crossing acci-**
**dent: evidence:**
**harmless**
**error.**

gines. The object in introducing the testi-
mony is not clearly shown. It was doubtless
proper to show that plaintiff was a skilled me-
chanic in fixing the amount of his damages; but it was not
proper for plaintiff to show that he was skilled in the hand-
ling of engines for the purpose of having the jury infer that
he was careful at the time of the accident. However, it doubt-
less was competent on plaintiff's theory that, after seeing the
engine and train approaching, he used ordinary care to avoid
the accident, and his skill in handling the engine might have
had some bearing upon that question. But the answer of
the witness that he considered the plaintiff good in the
handling of engines was perhaps not as explicit as it should
have been, and the court might well have excluded it on
any theory. On the other hand, we do not see how any
prejudice could have resulted from failure to exclude it.
The question, at any rate, was a very collateral one and
could have had no bearing, upon the case, save as we have
indicated.

Plaintiff was asked whether the engine whistled between
the Whitmore and the Weaver crossings,

**2. SAME: evi-**
**dence: con-**
**clusion.**

and he said it did not. The question called
for a fact, and the witness assumed to answer
it. The weight of his testimony was for the jury, and the
answer was not a conclusion.

A man by the name of Teel, who was a baggageman on
the train which struck the plaintiff, testified for the de-
fendant as to the sounding of four whistles as the train ap-
proached the town of Coin on the evening in

**3. SAME: evi-**
**dence: cross**
**examination.**

question. On cross-examination, over defend-
ant's objections, plaintiff's counsel was per-
mitted to ask him about other signals made by the engine
on this trip on its passage from Council Bluffs to Coin. This
line of examination was clearly admissible to test his powers

of observation and recollection. So much for the rulings on evidence.

II. General complaint is lodged against the instructions, and of some of them in particular. The main point is that the court failed to refer to section 1571-h of the Code Supplement, which reads as follows:

No person shall operate a motor vehicle on a public highway at a rate of speed greater than is reasonable and proper, having regard to the traffic and use of the highway, or so as to endanger the life and limb of any person. . . . Upon approaching a crossing of intersecting public highways, or a bridge, or a sharp curve, or a steep descent, and also in traversing ·such crossing, bridge, curve or descent, a person operating a motor vehicle shall have it under control and operate it at a rate of speed less than hereinbefore specified, and in no event greater than is reasonable and proper, having regard to the traffic then on such highway and the safety of the public.

We do not see that it has any bearing upon the case, save as it requires the operator to have his machine under control in certain instances and to operate it no faster than was reasonable and proper, having regard to the safety of the public. This was incumbent on plaintiff, notwithstanding the statute which has but a remote application, if any at all, to railway crossings. Plaintiff was obliged to use reasonable and ordinary care in approaching the crossing, not only for his own safety, but the safety of the public as well. The defendant asked no instruction upon the proposition that the statute applied, and, as it does not do so in terms, there was no error in failing to instruct with reference thereto.

4. SAME: crossing accident: statute: instruction.

Instruction No. 8 is complained of. It reads as follows:

The plaintiff claims that the defendant company, through its employees, was negligent in that it allowed the train in

question to approach the crossing, where the accident occurred,

5. SAME: negligence: instruction: sufficiency.

noiselessly, without signals or warnings, and at a high rate of speed. Now, there is no positive provision of law requiring signals or warnings of the approach of a train to a crossing, excepting that above set out requiring the sounding of the whistle twice, sharply, at least sixty rods before reaching the crossing, and the ringing of the bell continuously thereafter until the crossing is passed. There is no law limiting the rate of speed at which trains may be run at places like the crossing in question. It cannot be said as a matter of law that any rate of speed would, in and of itself, be negligence. But the defendant company was required to so run and manage its train as it approached the crossing in question, and to give such signals on the approach of its train to the crossing as would protect persons passing over said crossing from unnecessary danger, when such persons were using reasonable care on their part by a vigilant use of their senses of sight and of hearing to learn of the approach of the train and to avoid injury. If it appears from the evidence that at the time in question, by reason of obstructions along the highway or defendant's right of way preventing those approaching the crossing on the highway from seeing or hearing the approach of the train from the northward, and that by reason of the speed at which the defendant's train approached the crossing, ordinary care and prudence on defendant's part in protecting persons who were attempting to pass over said crossing from unnecessary danger required that signals other and additional to those required by the statute should be given so as to warn persons near the crossing of the approach of the train and enable them to avoid injury when exercising reasonable care on their part, then it was the duty of the defendant company to give such additional signals, and a failure so to do would be negligence. But, as before stated, it cannot be said that any rate of speed in approaching the crossing in question would be, in and of itself, negligence. And it cannot be said that the defendant company was required by law to give any signals other or different from those provided by the statute as the train approached the crossing, unless by reason of obstructions to seeing and hearing the train as it approached the crossing and the speed at which the train approached the crossing, and such additional signals were necessary in order to protect persons approaching the crossing from unnecessary danger from the approach of

the train, when such persons, upon their part, were exercising reasonable care by a vigilant use of their senses of sight and hearing to observe and know of the approach of the train to the crossing. If it appears from the evidence that the signals required by the statute (that is, the sounding of the whistle twice, sharply, at least sixty rods before reaching the crossing, and the ringing of the bell continuously thereafter until the crossing was passed) were sufficient to apprise persons of the approach of the train, when such persons were exercising reasonable care upon their part in looking and listening for the train, then the law would not require that the defendant should give any other or additional signals to those required by the statute. And negligence cannot be imputed to the defendant company by reason of the speed at which it runs its train at the crossing, if in approaching the crossing it gave such signals or warnings of the approach of the train to the crossing as were reasonably sufficient to apprise persons approaching the crossing of the approach of the train to the crossing so that such persons could avoid injury by the exercise of reasonable care upon their part. What signals were in fact given by the employees of the defendant in charge of said train as the train approached the crossing, and whether they were sufficient, when considering the surroundings at the crossing and the speed of the train, to apprise persons approaching the crossing of the approach of the train, so that such persons could avoid injury by vigilant use of their senses of sight and hearing, are all questions of fact to be decided by you from all of the evidence bearing thereon. Unless it does appear from the evidence that the employees of the defendant in charge of the train in question failed to give the statutory signals or failed to give such signals additional thereto as ordinary prudence would have dictated were necessary in order to apprise persons approaching the crossing of the approach of the train in time so that such persons could avoid injury by the exercise of reasonable care upon their part, then, in my judgment, the evidence will fail to show negligence upon the part of the defendant in this case, and in that event your verdict should be for the defendant.

We do not exactly understand the criticism made of this. It seems to us to fairly cover the case even from defendant's standpoint, and no error is pointed out which

would justify its condemnation. The instruction has support in *Kinyon v. Railroad Co.*, 118 Iowa, 349; *Bruggeman v. Railroad Co.*, 147 Iowa, 187. See, also, *Baltimore & O. R. R. v. Griffith*, 159 U. S. 603 (16 Sup. Ct. 105, 40 L. Ed. 274).

The general complaint of the instructions that they were abstract rather than concrete, academic instead of practical, and that they did not fairly cover the case is without merit.

III. At the conclusion of plaintiff's testimony, and again at the conclusion of all the evidence, defendant moved for a directed verdict, and these motions were both overruled. The first ruling was waived because defendant did not rest thereon but proceeded to introduce its own testimony. The second was not waived, and, as the same points are made in the motion for a new trial, they will next be considered. The propositions are: First, that there was no evidence of any negligence on the part of the defendant; and, second, that the testimony conclusively shows that plaintiff was guilty of contributory negligence.

6. PRACTICE: motion for directed verdict: waiver.

On the issue of negligence (that is, as to failure to blow the whistle or ring the bell after the signal had been given for the Whitmore crossing, and as to the condition of the weeds and brush upon the right of way, and as to the obstructions to a view of a train approaching the crossing or of the engineer in seeing one at or approaching the crossing as he approached it with his train), the testimony is in sharp and irreconcilable conflict. The greater number of witnesses seem to be with the defendant; but it is not our province, on appeal, to settle such conflicts. These, under our system, are for a jury. If this were not so, a jury would have no function to perform.

7. SAME: verdict: conclusiveness.

Defendant contends that plaintiff's testimony on the question of negligence was all negative in character, and

that its testimony was all positive, and that positive should
always outweigh negative testimony. The
trouble with this argument lies in the first
premise. The testimony for plaintiff under
our cases was not purely negative in character. See *Selensky v. R. R. Co.*, 120 Iowa, 113; *Mackerall v. R. R. Co.*, 111
Iowa, 549. Again there was a sharp dispute in the testimony
regarding the speed of the train, but here again the question was for a jury.

8. RAILROADS: negative and positive evidence.

As to contributory negligence of the plaintiff, the same
observations may be made. Plaintiff's version of the affair from the time he turned
at the Gibson corner, where it is conceded,
as we understand it, that he could not have seen the approaching train, was as follows:

9. SAME: contributory negligence: evidence.

We were going about twelve miles an hour when we
turned the corner. While going up to the corner, I was paying attention to the car and was driving. I wasn't engaged in
conversation. I wasn't talking or laughing. I spoke once to
my companion in the automobile. Was no laughing or
loud talking. I don't know whether or not there was
any bell ringing on any railroad engine on the Wabash
track at that time within a radius of a half mile. I did
not hear a bell. When I got to the corner that evening, as
I turned around the corner I shut the gasoline off the car and
let it coast down hill and held it with the brake. I had regular
pneumatic tires. The surface of this highway at this crossing
was in good condition, just as smooth as the floor, no rough
places to speak of, no chucks, bumps, or anything. The car
didn't make any noise. There wasn't any exhaust. I had the
fire shut off going down that hill. It made no noise going to
the crossing. Well, we turned the corner about twelve miles
an hour, and I slowed down on the way to about four miles an
hour until down about the crossing. I had a speedometer on
the car. Had observed the speeds we were making at various
times. The speedometer was located on the dashboard in front
of me. When we got within fifteen feet of the west rail we
were going at a good fast walk of an ordinary man. I looked
where I could see the track and kept watching and looking for

a train both ways up and down the Wabash track. We turned at the corner and started down the hill and I kept watching to see if there was a train coming. We wasn't talking at all. I listened for the train all the way down. When I got to the edge of the right of way I kept watching up and down the track. Up the track mostly to see if there was a train coming. Listening all the time and wasn't talking. Looked to see if there was a train coming. I didn't know the weeds had grown up along the track so high as they was; in fact, I didn't know there was weeds there, and I didn't know there was what you call a dangerous crossing if you slowed up and watched for the train. I hadn't been over that crossing that evening, but I had been the day before. No, I didn't notice there were weeds that day. I don't know whether the weeds were high enough to exclude the view of an approaching train. I had been over that crossing the afternoon before that day. I noticed a kind of jump-off on the east side of the east rail where the dirt had been worn away six or eight inches. When I got within thirty feet of the west rail I was listening and looking up the track to see if a train was coming. I suppose I looked down the track. When I got within twenty feet of the west rail I kept watching up the track, listening for bell or whistle. Heard nothing. I didn't hear a train whistle at any time coming down the hill. I didn't hear a bell at any time. When within fifteen feet of the west rail I looked up the track and kept watching. Didn't see a train coming. Listened all the time. No sound of bell or whistle. When I got within ten feet of the track I looked up the track and kept watching all the time and listening. Heard and seen nothing. The auto and I were making no noise. We weren't talking. Hutchinson never said a word from the corner down to the crossing. Never spoke. Q. What did you do, when you arrived within about six feet of the crossing, with reference to looking or listening? A. Well, I was beginning to pay attention to the crossing ahead in the road. for I knew I had a bad place to cross, and I paid attention to the crossing as well as trying to look for the train. Q. Did you look? A. I did. Looked and listened, heard and saw nothing. Wasn't making any noise. It was a quiet summer evening. My hearing is supposed to be good. Never had any trouble. I discovered the train approaching me that evening when the front rim of the front wheel of my automobile was about four feet from the west rail of the Wabash track, near as I can guess. The

train was between fifty and one hundred feet up the track, as near as I can estimate, when I first saw it. I heard no noise. The track there above the crossing is straight, I suppose, about, oh, a little over eighty rods, maybe further. It is straight until above the Whitmore crossing. There it curves to the west. Where it curves toward the west above the Whitmore crossing, there is a hill to the west and south of the railway. The edge of the crossing is out probably one and one-half to two feet outside of the rail, so that when I first discovered the train I was within two or three feet of the edge of the cars as it would pass along. Well, when I first saw the engine, I first started to stop, started to reach for the emergency brake. I seen if I stopped then would stop the car on the track, and I thought my only salvation was to get across, so I had my hand —my foot on the throttle and opened the throttle on the engine and started across. I put my foot on the throttle in order to give it more power. That started it ahead. It picked up speed as soon as I opened the throttle. Well, I did it all in an instant. I couldn't tell how long. It just rushed through my mind, and as soon as I saw it I started for the brake and I knew if I stopped I would stop on the track. The best thing I could do was to press down on the throttle and open the car. It picked up speed as soon as I opened the car. I don't know whether I was on the track when the train struck the automobile. I know it struck. I know that much about it. I had a top on the automobile that night. The top was up, and I was on the south side as we went east, handling the wheel. My companion sat on the front seat on the left side. He possibly weighed one hundred and thirty-five or one hundred and forty pounds. His height was probably five feet four or six inches. I couldn't say how many bows there were in that top. Probably three. Just one on the left side in front.

There were no other eyewitnesses, save some who were at the Chicago, Burlington & Quincy Railroad depot, some four hundred or five hundred feet northwest of the Weaver crossing, and they did not pretend to see plaintiff when struck, although they heard the train coming on the defendant's road. These witnessses did not see the automobile after it had passed the Gibson corner.

Except some testimony as to the topography of the

ground, this is the entire testimony on the question of contributory negligence, and we think it made a case for a jury.

IV. The verdict was in this form: "We, the jury, find for the plaintiff, L. H. Wiar, and fix the amount of his damages at $1,995, and interest at 6 per cent. interest per annum from December 21, 1909."

**10. VERDICT: definiteness.**

The complaint made of it first appears in an amendment to the motion for a new trial which was filed more than a month after the verdict was returned. The only complaint then made was:

(1) The verdict returned by the jury and which was filed March 4, 1912, does not find in any definite sum for the plaintiff and is void for uncertainty.

(2) The jury ignored the instructions of the court, which instructions required that they find a definite sum, if they should find for the plaintiff, in that they return as their verdict finding that the plaintiff's damages were in the sum of $1,995, 'and interest at 6 per cent. interest per annum from December 21, 1909.'

We do not regard this as tenable. The interest was manifestly not included in the verdict; and to find the total amount allowed was a mere matter of computation, and this the clerk or the court might make. *Stevens v. Campbell*, 6 Iowa, 538; *Helphrey v. Railroad Co.*, 29 Iowa, 480.

**11. NEW TRIAL: amendment to motion.**

Under our previous holdings, the amendment to the motion came too late in any event. *Dutton v. Seevers*, 89 Iowa, 302. The amendment was not in this respect germane to anything covered by the original motion. The motion to strike appellee's amended abstract is overruled.

Finding no prejudicial error, the judgment must be, and it is *Affirmed*.

WEAVER, C. J., and GAYNOR and WITHROW, JJ., concur.